Abraham BONOWITZ, Joseph E. Byrne, Thomas Muther, Jr., Jon Holtshopple, William R. Pelke, Kurt J. Rosenberg, Stephanie B. Gibson, Appellants,

v.

UNITED STATES, Appellee.

No. 97–CM–1611, 97–CM–1654, 98–CM–486, 97–CM–1651, 97–CM–1662, 97–CM–1652, 97–CM–1663.

District of Columbia Court of Appeals.

Argued Jan. 7, 1999.

Decided Aug. 5, 1999.

As Amended on Grant of Rehearing in Part Dec. 9, 1999.

Nina Kraut, Washington, DC, appointed by this court, for appellant Bonowitz.

Mark Goldstone, appointed by this court, for appellants Byrne, Muther, Jr., Holshopple, Pelke, Rosenberg and Gibson.

David B. Goodhand, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Mary–Patrice Brown, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and REID, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge.

Appellants were convicted of unlawful parading and assembling on Supreme Court grounds in violation of 40 U.S.C. § 13k (1994). They argue on appeal that the application of that statute violates their First Amendment rights by impermissibly prohibiting speech. We affirm.

On January 17, 1997, members of the Supreme Court Police observed appellants demonstrating on the sidewalk below the Supreme Court plaza area. Shortly thereafter, appellants began to move as a group inside the plaza area to the top of the steps leading to the Court's main entrance. Once appellants reached the main entrance they unfurled a banner thirty feet long by four feet wide which read "STOP EXECUTIONS," and they began to sing and chant in unison.

The police verbally warned appellants that they were in violation of § 13k, and would be arrested if they continued. After handing appellants a small card which outlined the contents of § 13k and giving them the opportunity to desist, the police arrested appellants and charged them with unlawful parading and assemblage on Supreme Court grounds.

In a non-jury trial, the trial court found appellants guilty of violating § 13k, which provides that "[i]t shall be unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement." The court rejected appellants' contention that the Supreme Court plaza was either a public forum or a government-designated public forum. Instead, the trial court concluded that the plaza was a nonpublic forum, and that clause 1 of § 13k (the "congregation

clause") is constitutional as applied to prohibit appellants' protest.

■ Appellants argue here that the Supreme Court plaza is a government-designated public forum, and thus any laws regulating speech in the plaza should be subject to the same strict level of scrutiny applied to traditional public fora. Appellants also contend that § 13k is a content-based regulation of speech and is unconstitutional because it is not narrowly tailored to serve a compelling government interest.[1]

The government, on the other hand, contends that the plaza is a nonpublic forum, and thus 13k's restrictions on speech are subject to a more relaxed level of scrutiny. Specifically, the government contends that § 13k is constitutional under the First Amendment because it is reasonable and does not constitute viewpoint discrimination.

■ "[T]he Court [has] identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). "Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long standing tradition or by government fiat,' the property has been 'devoted

to assembly and debate.'" *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (quoting *Perry, supra*, 460 U.S. at 45, 103 S.Ct. 948). Any attempt by the government to limit speech in a public forum will be subject to a strict level of scrutiny. The precise level of such scrutiny will depend on whether the government restrictions are content-based or content-neutral. Content-based restrictions must be "necessary to serve a *compelling* state interest and [must be] narrowly drawn to achieve that end." *Perry, supra*, 460 U.S. at 45, 103 S.Ct. 948 (emphasis added) (citation omitted). Content-neutral restrictions of the time, place, and manner of expression may be enforced if they are "narrowly tailored to serve a *significant* government interest, and leave open ample alternative channels of communication." *Id.* (emphasis added) (citations omitted).

■ Unlike traditional public fora, government-designated public fora are created by "purposeful government action." *Forbes, supra*, 523 U.S. at 677, 118 S.Ct. 1633. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." *Cornelius, supra*, 473 U.S. at 802, 105 S.Ct. 3439. "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Forbes, supra*, 523 U.S. at 677, 118 S.Ct.

1. Appellants also make a number of alternative arguments. First, they argue that clause 2 of 40 U.S.C. § 13k—the "banner clause"—is an unconstitutionally overbroad regulation of speech. However, as the trial court held, if appellants are guilty of violating clause 1 of 40 U.S.C. § 13k—the "congregation clause,"—and clause 1 is constitutional, it is not necessary to address the constitutionality of the banner clause. Second, appellants contend that the trial court erred in denying their motion for judgment of acquittal as to the congregation clause. We reject this argument for the same reasons we reject appellants' arguments on the merits. Third, appellants allege that the trial court erred in failing

to dismiss the informations as duplicitous. In raising this issue, appellants assert that the banner and congregation clauses of § 13k are two separate offenses that the government improperly charged conjunctively in the same count. Certainly, as the Supreme Court stated in *United States v. Grace*, "[s]ection 13k prohibits two distinct activities." 461 U.S. 171, 175, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). Nevertheless, "[t]he government may in a single information ... charge all of the prohibited acts in the conjunctive and under such charge proceed to prove any one or more of the acts." *United States v. Miqueli*, 349 A.2d 472, 475 (D.C.1975) (citations omitted).

1633 (citing *Cornelius, supra,* 473 U.S. at 802, 105 S.Ct. 3439; *United States v. Kokinda,* 497 U.S. 720, 726–27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion of O'Connor, J.)).

■ Finally, "[w]here the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum or not a forum at all." *Forbes, supra,* 523 U.S. at 677, 118 S.Ct. 1633. In such a case, the government can regulate speech "as long as the restrictions are reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius, supra,* 473 U.S. at 802, 105 S.Ct. 3439.

*Pearson v. United States,* 581 A.2d 347 (D.C.1990), presented this court with a challenge to the constitutionality of § 13k similar to the challenge mounted by appellants here. The appellants in *Pearson* were among fifty thousand protestors who participated in the annual "March for Life" to the Supreme Court to protest the Court's decision in *Roe v. Wade.*[2] *Id.* at 349. Although the vast majority of the fifty thousand protestors demonstrated legally along the sidewalks and streets surrounding the Supreme Court plaza, Pearson and others entered the plaza area and were arrested pursuant to § 13k. *Id.* After conviction of violating, *inter alia,* § 13k by unlawful parading and assemblage on Supreme Court grounds, the *Pearson* appellants pressed before this court the argument that the plaza was a government-designated public forum because the Court regularly permitted access to the plaza to attorneys and others associated with the Court's cases in order to disseminate information to the media. *Id.* at 353. We rejected that argument, however, holding:

> Even if, as appellants assert, the Court "regularly" permits the press and media to use the plaza and steps for reporting purposes, this practice does not compromise the non-public status of the Court

and its grounds. At most, if such action created a "limited" public forum, the constitutional right of access would extend only to other activities of similar character. *Perry, supra,* 460 U.S. at 48, 103 S.Ct. at 956. Clearly appellants' demonstration activity is not of similar character to that of the media, attorneys, and others who use the Court's grounds for the limited purpose of disseminating information about and from the Court to the public.

*Id.*

Here, appellants rely on *Pearson* to advance their position in two ways. First, appellants attempt to distinguish *Pearson* from the instant case by suggesting that the record in *Pearson* "was devoid of any evidence whatever which showed that the plaza [had] been used for public expression by the media, attorneys, and others." Appellants further suggest that, unlike the record in *Pearson,* the record in this case "is replete with credible evidence that the plaza is, indeed, used by the media, by attorneys and litigants, by professors and other scholars, and by commercial filmmakers." The explicit assumption underlying our holding in *Pearson,* however, defeats this attempt at distinction. The *Pearson* holding assumed the existence of activity "of the media, attorneys, and others who use the Court's grounds for the limited purpose of disseminating information about and from the Court to the public," and concluded that "this practice does not compromise the non-public status of the Court and its grounds." *Id.* at 353. Therefore, we reject appellants' suggested distinction between this case and *Pearson.*

Second, appellants attach a great deal of significance to the above-quoted "at most, if" language in *Pearson* which addressed, but did not adopt, the hypothesis that the plaza might have become a government designated public forum. *Id.* Appellants argue that this language, in light of recent Court-permitted access to the entertainment media, means that *Pearson* must

---

2.  410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147    (1973).

now be read to stand for the proposition that the plaza is a government designated public forum, and that thus § 13k is subject to strict scrutiny. Appellants point out that after our 1990 decision in *Pearson*, the Court permitted plaza access for commercial film purposes, including "The Pelican Brief" and "The People v. Larry Flynt." We find appellants' argument unpersuasive, principally because the slight additional permitted use of the plaza is insubstantial and, in any event, notably different from what appellants attempted. Moreover, subsequent to our holding in *Pearson*, the Supreme Court has delineated more precisely the line between nonpublic fora and government-designated public fora. In *Forbes, supra*, the Court clarified the distinction between the two types of fora by establishing the "general access" versus "selective access" dichotomy.

■ "On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers ...." *Forbes, supra*, 523 U.S. at 679, 118 S.Ct. 1633. For example, in *Widmar v. Vincent*, 454 U.S. 263, 267, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court held that a state university created a designated public forum when it routinely provided university facilities for meetings of registered student organizations.

■ "On the other hand, the government does not create a designated public forum [and thus the property is a nonpublic forum] when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, *"obtain permission* to use it."'" *Forbes, supra*, 523 U.S. at 679, 118 S.Ct. 1633 (quot-

ing *Cornelius, supra*, 473 U.S. at 804, 105 S.Ct. 3439) (emphasis added). For example, In *Perry*, the Supreme Court held that a school district's internal mail system was a nonpublic forum, because "[i]n contrast to the general access policy in *Widmar*, school board policy did not grant general access to the school mail system. The practice was to *require permission* from the individual school principal before access to the system ... was granted." *Cornelius, supra*, 473 U.S. at 803, 105 S.Ct. 3439 (emphasis added).

■ Upon application of the "general access" versus "selective access" distinction to the present case, it becomes clear that the Supreme Court plaza is a nonpublic forum. Unlike the school meeting facilities in *Widmar*, the plaza was not generally open to any class of speakers of which appellants were members. According to the testimony of the late Ms. Toni House, the Public Information Officer for the Supreme Court at the time of trial, plaza access for First Amendment purposes is limited to certain classes of speakers, none of which include the protestors here. These classes include anyone associated with a case before the Court, the news media, and the film media for movies relating to the Supreme Court. Moreover, even within these distinct classes of speakers, individual members routinely were required to obtain permission to gain access to the plaza from Ms. House and her office. Therefore, as in *Perry*, the Supreme Court's selective process of allowing only certain classes of speakers access to the plaza and requiring individual members of these classes to obtain advance permission leads to the conclusion that the plaza is a nonpublic forum for First Amendment purposes.[3]

3. We observe that although the government does not make it here, a plausible argument might be made that the plaza is not a forum at all. *See Forbes, supra*, 523 U.S. at 675, 118 S.Ct. 1633 ("Although public broadcasting as a general matter does not limit itself to scrutiny under the forum doctrine, candidate debates present the narrow exception to the

rule"—suggesting that public broadcasting in general is not a forum at all). It would be pointless for this court to embark on an exploration of this matter because viewpoint neutrality would be required of the government even regarding activities in a place that is not a forum. *See International Soc'y for Krishna*

■ Even though the plaza is a non-public forum, this "does not mean that the government can restrict speech in whatever way it likes." *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 687, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." *Forbes, supra*, 523 U.S. at 682, 118 S.Ct. 1633 (citing *Cornelius, supra*, 473 U.S. at 800, 105 S.Ct. 3439).

■ Certainly, § 13k's restrictions are reasonable in light of the plaza's two primary purposes: "to permit the unimpeded access and egress of litigants and visitors to the Court, and to preserve the appearance of the Court as a body not swayed by external influence." *United States v. Wall*, 521 A.2d 1140, 1144 (D.C.1987) (footnote omitted). As we held in *Wall*, " § 13k's prohibition on processions and assemblages in the plaza area and main entrance steps of the Supreme Court is reasonable." *Id.*[4]

Furthermore, appellants' exclusion from the plaza was not based on the viewpoint they were expressing. Viewpoint-based discrimination is "discrimination against one set of views or ideas [and] is but a subset or particular instance of the more general phenomenon of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830–31, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (citation omitted).[5] The record is devoid of evidence that appellants' exclusion from the plaza was based on the "substantial content" of appellants' speech or appellants' "ideology[,] ... opinion or perspective." *See id.* at 829, 115 S.Ct. 2510. There is no evidence that the Court "target[ed] ... the particular views" of appellants concerning the death penalty. *See id.* Rather, the record shows that under its regular practice, the Court allowed only persons associated with a case before it, news media and certain film media to use the plaza, and enforced § 13k against all protests.[6]

---

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 679, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

4. In a footnote to its memorandum opinion and order, the trial court stated that "[i]t may be that the terms 'order and decorum of the court' necessarily confine themselves to activity more disruptive or more substantial (in degree or number) than normally engaged in by tourists." The trial court went on to note that this court had not "expressly incorporated the so-called 'tourist' standard" in its previous rulings on § 13k as it had in cases brought pursuant to D.C.Code § 9–112(b)(7) dealing with buildings associated with the legislative branch. *See, e.g., Berg v. United States*, 631 A.2d 394, 398 (D.C.1993). The trial court did not, as appellants argue, hold that the tourist standard was applicable in this case, although it stated in dicta that its application seems "appropriate." Because of the manifest difference between the legislative branch—which must be accessible to expressions of popular opinion—and the judicial branch—which renders opinions free from the pressure of popular opinion, we decline to engraft a tourist standard onto the provisions of § 13k. *See Grace, supra*, 461 U.S. at 183, 103 S.Ct. 1702. (It should not "appear to the public that the Supreme Court is subject to

outside influence or that picketing or marching, singly or in groups, is an acceptable or proper way of appealing to or influencing the Supreme Court."); *Wall, supra*, 521 A.2d at 1145 ("The danger of the appearance of outside influence upon the Court is ever present.").

5. Unlike content discrimination generally, however, viewpoint discrimination is presumed impermissible when directed against speech otherwise within the forum's limitations. *Rosenberger, supra*, 515 U.S. at 830, 115 S.Ct. 2510.

6. In an addendum filed some six months after their principal brief, appellants contend that § 13k, in its entirety, is void for vagueness. Appellants acknowledge that they did not raise this issue in the trial court, and thus we are not required to consider it here "except in exceptional situations where a clear miscarriage of justice would result otherwise." *Southall v. United States*, 716 A.2d 183, 189 (D.C. 1998). As the argument is readily dealt with, we address it. We hold that § 13k is not unconstitutionally vague. In order for appellants' vagueness argument to prevail, they "must demonstrate that [§ 13k] is impermissibly vague in all of its applications." *Vil-*

Accordingly, we conclude that: (1) § 13k is a constitutional regulation of a nonpublic forum, because it is reasonable in light of the purpose served by the Supreme Court plaza; and (2) the exclusion of appellants' protest was not viewpoint-based and thus was not violative of the First Amendment.

*Affirmed.*

*lage of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Appellants make no such showing. Moreover, as we stated in *Pearson,* section 13k is not un-constitutionally vague "when limited to protection of the Supreme Court building and grounds, and persons. and property within, and maintenance of proper order and decorum." *581 A.2d at 347, 359 (D.C. 1990).*